UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ELAINE TORRES,                                        :
                                                      :   **MEMORANDUM DECISION AND**
                                    Plaintiff,        :   **ORDER**
                                                      :
                  - against -                         :   20-cv-4007 (BMC)
                                                      :
                                                      :
THE CITY OF NEW YORK, KRISTIN                         :
FLANAGAN, WILFREDO RAMOS, ALAN                        :
BUNGAY, RENETTE PIERRE-ANTOINE,                       :
ROBERT CHIUSANO, and JOHN and JANE                    :
DOE 1 through 10,                                     :
                                                      :
                                    Defendants.       :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff brings this action under 42 U.S.C. § 1983, and corresponding provisions of state law, for false arrest, malicious prosecution, denial of fair trial, and failure to intervene, in addition to state law claims of assault and battery. Plaintiff's arrest occurred because she has a special needs son who ran into a business and said that his mother had beaten him and that he was afraid. The police were called, they heard his story, and the child showed them bruises on his arm. The child also wrote and signed a statement detailing his assault. Other police officers then arrested plaintiff based on this evidence. However, the child recanted his story shortly thereafter and a prosecutor ultimately dismissed the case in the interests of justice.

Plaintiff's claims for false arrest run afoul of the well-established principle that in determining the existence of probable cause, police officers are not required to act as judge or jury. The child's story provided sufficient grounds to make an arrest and probable cause defeats plaintiff's claims, notwithstanding the child's later recantation. However, plaintiff may proceed on her claims of malicious prosecution and denial of a fair trial as to Officer Flanagan and

Sergeant Chiusano, as there are factual issues in dispute.  Defendants' motion for summary judgment is therefore granted in part and denied in part.

## BACKGROUND

On May 29, 2019, plaintiff's 13-year-old son B.C. did not come home after school.  After calling his school to inquire as to his whereabouts, plaintiff got into her car and drove around to look for him.  She stopped by a Wendy's where she knew her son routinely hung out with friends.  There, she spotted defendant Youth Officers Alan Bungay and Renette Pierre-Antoine and told them she was looking for her son.  They said they might have seen him with another youth just a few minutes before.

Plaintiff found B.C. across the street from his school, but he refused to enter her car and ran away.[1]  He ran into a nearby business – a senior living center – and told the staff there that he was afraid of his mother because she been "giving him bruises."  He asked the staff to hide him and call 911, which they did.

Officers Bungay and Pierre-Antoine responded to the radio run.  Upon arrival, the senior living center staff advised them that B.C. was hiding in a back office of the building, that he appeared frightened, and that he looked like he had been crying.  The two officers proceeded to interview B.C.  He told them that plaintiff was physically abusing him, and that plaintiff was looking for him to beat him further.  He also showed the officers bruising on his arm, telling them that his mother had caused the bruises.  The officers later photographed B.C.'s injuries, which are part of this record.

The officers took B.C. to the precinct house to speak with him further.  Once there, B.C. wrote a signed statement averring that plaintiff had assaulted him.  He wrote that the abuse had

---

[1] Plaintiff clarified that she first saw B.C. at the Wendy's, but he also ran away from her at that point as well.

started "a while ago" after he had a bad day at school.  He also wrote that plaintiff "had made other family members bleed" and that as a result, he was scared.  B.C.'s statement noted that when his mother had found him that afternoon, she had told him that when she got out of her car, she was going to hurt him, which was why he had run away and asked for help.

After B.C. signed the statement, Officer Bungay submitted a report of suspected child abuse to the New York City Department of Adult and Child Services.  An ACS investigator later spoke to B.C., and he repeated his allegations that his mother hit him for doing poorly in school. He added that plaintiff had hit him in the past in his stomach, arm, and face, and one time she had given him a bloody nose.

As the two Youth Officers were finishing up with their shifts, they informed defendant Officers Kristin Flanagan and Wilfredo Ramos of B.C.'s allegations.  Officers Flanagan and Ramos spoke to B.C., and he repeated his allegations that his mother was hitting him for not doing well at school and was threatening to hurt him

At approximately 5 p.m., plaintiff called 911 to report that B.C. was missing.  Roughly half an hour later, she received a call telling her to go to the precinct house because her son was there.  When she got there, she was placed under arrest by Officers Flanagan and Pierre-Antoine who advised her that B.C. had made allegations against her and that she was being arrested based on that complaint.  She denied the allegations and informed them that B.C.'s bruises were from a recent school incident and that there was a school record of it.  In her deposition, plaintiff has acknowledged that she had hit B.C. in the past, but not with the severity he was claiming.

When B.C. "peeked out" (according to his testimony) of the interrogation room he was in and saw plaintiff at the front desk in handcuffs, he had an episode of decompensation, becoming so out of control that he had to be handcuffed.  He told Officers Pierre-Antoine, Bungay, Ramos

that plaintiff "didn't do it," and that he had received his bruises in an incident at school.  Officer Ramos recalled relaying this information to Officer Flanagan, who told him that she had subsequently discussed B.C.'s recantation with Sergeant Chiusano.  Officer Flanagan later relayed to Officer Ramos that the sergeant had given her the go-ahead to proceed with the process to file charges during this conversation.

Officer Flanagan then met with a prosecutor and signed a criminal court complaint.  The criminal complaint did not disclose that B.C. had recanted.  Officer Flanagan informed the prosecutor that plaintiff had protested that B.C. had gotten in trouble at school and that plaintiff also told her that there was a record of B.C. being bruised in a playfield incident at school.

Plaintiff was charged with endangering the welfare of a child, third degree assault, and second-degree harassment.  She was arraigned at Central Booking the next day and released on her own recognizance.  Three weeks later, at a second court appearance, the court approved the prosecutor's request to dismiss the charges in the interest of justice.  The prosecutor stated on the record that "The People were shown school records of [B.C.'s] injuries and they were from another student."

This action followed.

## DISCUSSION

## I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Id.

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdziebloski v. Town of E. Greenbush, 336 F. Supp. 2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)). In determining whether genuine issues of material fact exist, the court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. Cty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). In deciding a summary judgment motion, "the court cannot properly make credibility determinations or weigh the evidence." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017).

## II.    False Arrest

In analyzing a § 1983 claim for false arrest, courts look to the law of the state in which the arrest occurred. Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006).[2] "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." Id. at 152; see also Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002). An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

---

[2] As a § 1983 claim for false arrest "is substantially the same as a claim for false arrest under New York law," this Court's analysis is the same for both claims. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

The Supreme Court has held that the proper analysis on a false arrest claim is "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly, 439 F.3d at 153 (citing Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). Even when probable cause is based on mistaken information, it can still exist so long as the arresting officer acted reasonably and in good faith in relying on that information. Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994). "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989). "[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001). "In sum, probable cause does not demand any showing that a good-faith belief be 'correct or more likely true than false.'" Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).

The facts available to the officers at the time of arrest in this case were sufficient to constitute probable cause to arrest plaintiff for endangering the welfare of a child and/or harassment under New York law. The police had a vulnerable victim complaining to them of being threatened by his mother, who also alleged that she had previously injured him. They knew that he was fearful enough to run away from his mother. They saw bruises on the child which he claimed his mother had inflicted on him. B.C. signed a written statement to that effect

6

at the precinct.  The police knew that B.C. had felt compelled to seek refuge with strangers at the senior home to which he fled, telling them a similar story, and asking them to hide him.  The existence of probable cause to arrest is clear.

Plaintiff raises additional facts that she contends put the officers on notice that B.C.'s statements were not credible and therefore the police should not have arrested her without further investigation.  It is well-established that the contradictory evidence known to the officers at the time of arrest can negate probable cause by giving rise to a duty of further inquiry.  See, e.g., Lowth v. The Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996).  However, this is not a case in which a complainant implicated a suspect with an accusation that the suspect descended from a spaceship and threatened the complainant with a ray gun.  The additional facts to which plaintiff points did not undermine the existence of probable cause.

First, there is evidence that B.C. "changed his story" several times sometime before his mother's arrest, although there is no evidence as to *how* he changed his story.  Having reviewed the transcripts of the police officers' depositions of what B.C. was saying at that time, B.C. seemed to merely add or leave out details when telling his version separately to different officers (for example, he didn't mention his "bloody nose" in every telling of the story).  These changes in his story did not undermine the basic thrust that plaintiff had beaten B.C. and that he was trying to get away from her.

B.C. did materially change his story after his mother's arrest, exonerating her and corroborating her explanation of a school incident.  However, this occurred after the arrest and thus does not impact probable cause at the time of the arrest.[3]  More importantly, B.C.'s

---

[3] Plaintiff argues that there is evidence that B.C. recanted before his mother's arrest.  There is not.  Plaintiff cites only to the ACS report of the incident to support her argument, which notes that B.C. "change[d] the story about a baseball."  However, this report was necessarily made after plaintiff's arrest, as it states very clearly that B.C. "started cursing and threading [sic] everyone in the precinct when he saw that [his mother] was arrested."

recantation must be put in the context of a reported domestic violence incident.  The courts in

this Circuit, scientists, and commentators have repeatedly recognized the pressure on domestic

violence victims to recant and protest their attackers' innocence and the unreliability of those

recantations.  See e.g. United States v. Carthen, 681 F.3d 94, 103 (2d Cir. 2012) ("[A]

recantation is not unusual in domestic violence cases [because v]ictims of this type of violence

often are protective of, and deny allegations against, their abusers."); Haouari v. United States,

510 F.3d 350, 353 (2d Cir. 2007) (a recantation from a victim of domestic violence should be

viewed "with the utmost suspicion."); Lindsay C. Malloy et al., Filial Dependency and

Recantation of Child Sexual Abuse Allegations, 46 J. Am. Acad. Child Adolesc. Psychiatry 2

(2007) (finding high rates of recantation among substantiated cases of child abuse and

recognizing the role of familial pressures to recant); Lisa Marie DeSanctis, Bridging the Gap

Between the Rules of Evidence and Justice for Victims of Domestic Violence, 8 Yale J. L. &

Feminism, 359, 367-68 (1996) (finding that victims of domestic violence are uncooperative in

approximately 80 to 90% of criminal prosecutions).[4]  The fact that B.C.'s recantation and

plaintiff's protestation of innocence both referenced a school incident involving a baseball does

not that change this, because victims and abusers can have a prearranged story to shield the

abuser.  The police officers were objectively reasonable in not accepting the recantation at face

value, even putting aside that it occurred after plaintiff had been arrested.

　　　Plaintiff also points to alleged inconsistencies between the Officers' depositions, the

arrest paperwork, the ACS paperwork, and the District Attorneys' notes:

- Officer Flanagan, in her deposition, denied speaking to ACS, but the ACS caseworker's
  paperwork states that the caseworker spoke to Officer Flanagan, and she (Officer

---

[4] B.C.'s violent outburst after he learned his mother had been arrested should not be viewed any differently than his
recantation.  It is fully consistent with a fear of potential retribution for having gotten her in trouble.  The point is
that police officers cannot be expected to make that judgment call.

Flanagan) advised the caseworker that B.C. had become aggressive and had to be handcuffed.

- Officer Flanagan denied at her deposition any knowledge of whether B.C. had become aggressive or that he was handcuffed. However, Officer Pierre-Antoine testified that he was standing at the front desk with Officer Flanagan and plaintiff and that B.C. was "screaming at the top of his lungs" in the interrogation room.

- Officers Ramos and Bungay both testified at their depositions that B.C. was not handcuffed, and Officer Pierre-Antoine testified that he did not remember B.C. having been handcuffed.

- ACS paperwork indicates that Officer Bungay informed ACS that B.C. had changed his story before plaintiff called 911, but at his deposition, Officer Bungay testified that B.C. had changed his story only after his mother's arrest.

- The D.A.'s paperwork reflected a conversation with Officer Flanagan in which Officer Flanagan reported plaintiff's statement, after she was mirandized, that B.C. had sustained the bruises in a school fight involving a baseball bat. But at her deposition, Officer Flanagan did not remember that conversation.

The problem with these alleged inconsistencies is that they are not material. Like many incidents involving multiple participants, this one was subject to the *Rashomon* effect – but not as to any facts that could make a difference as to plaintiff's false arrest claims. Assuming the facts in the light most favorable to plaintiff – plaintiff told separate officers that B.C. had sustained his injuries from a school fight during her arrest; B.C. had an emotional outburst when he found his mother had been arrested; he recanted when he saw his mother, and that he was so upset that he had to be handcuffed – none of those facts dissipate probable cause.

Again, all these events happened *after* plaintiff had been arrested. More importantly, they do not alter the fact that B.C. had told five people, including four police officers, and at least one and probably more strangers at the senior center, that he wanted to hide from his mother because she had threatened to beat him again; that he displayed bruises to suggest that his fear was well-founded; and that he told others like ACS that plaintiff had either bloodied his nose or injured other family members.

Plaintiff's argument does not properly reflect the difficult position of an objectively reasonable police officer.  The guiding principle that police officers should not act as prosecutor, judge, or jury in evaluating the credibility of a complainant, see Krause, 887 F.2d at 372, especially in a domestic violence situation where stories conflicts and recantations happen so frequently, has a sound basis.  Consider the degree of tragedy and recriminations that would have occurred if the officers had said, "we don't believe, B.C., so we're not arresting plaintiff and we're releasing B.C. to her custody"; that it was B.C.'s accusations, not his recantation, that was true; and that B.C.'s expressed fear of retribution then materialized in the worst way possible.  Cases like that happen all too often.  See, e.g., Brasley v. City of Bristol, No. 15-cv-6029810, 2017 WL 4097817 (Sup. Ct. Conn. Aug. 2, 2017); Fenton v. City of Chicago, 2013 Il. App. (1st) 111596, 984 N.E.2d 74 (2013);  City of Laurel v. Williams, 21 So.3d 1170 (Miss. 2009); see also Claire Amari, *'The Gun's in His Hand': Ohio Police Department Sued After Homicide Victim Left Alone with Her Abuser*, Cincinnati CityBeat (Dec.2, 2021), https://www.citybeat.com/news/the-guns-in-his-hand-ohio-police-department-sued-after-homicide-victim-left-alone-with-her-abuser-12288496 (domestic violence victim murdered less than 24 hours by abuser after she called 911 and police failed to make any arrests).  *Woman pleads guilty in death of 3-year-old Kansas girl*, AP News (Nov. 4, 2021), https://apnews.com/article/child-abuse-kansas-city-kansas-a1be974529542849adbecea3539c0684 (physically abused child murdered by her caretaker was found to have been the subject of two reports of child abuse four months prior, which were found unsubstantiated and not follow-up upon due to a recantation by the reporter).  That is why the law does not charge the officers with sorting out the different versions of events.  Although this is not to downplay the emotional trauma of the unnecessary (although not "false") arrest that

plaintiff suffered, had the case gone the other way, which the police officers simply did not know at the time plaintiff was arrested it would, the negative consequences could have been much worse.

### III.   Assault and Battery

As this Court has dismissed plaintiff's false arrest claims, so too must it dismiss her claims for assault and battery under New York state law.  "Under New York law, an assault is an intentional placing of another person in fear of imminent harmful or offensive contact," and "a battery is intentional wrongful physical contact with another person without consent." Rucks v. City of New York, 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015).  Where a police officer makes a lawful arrest, the "arrest is not an assault or battery under New York law, provided the force used is reasonable." Figueroa v. Mazza, 825 F.3d 89, 105 n.13 (2d Cir. 2016).  Generally, claims of assault and battery premised on the "act of handcuffing plaintiff pursuant to a lawful arrest" are not viable" as such an action is "entirely reasonable." Tiburcio v. City of New York, 172 A.D.3d 455, 455, 97 N.Y.S.3d 851 (1st Dep't 2019).

As plaintiff was lawfully arrested, her contention that defendants handcuffed her too tightly could only be an assault and battery if the "force used is [un]reasonable." Figueroa, 825 F.3d at 105 n.13.  However, to succeed on such claims under New York law, a plaintiff must "testify, or submit other evidence, that [s]he sustained physical injury as a result." Davidson v. City of New York, 155 A.D.3d 544, 544, 65 N.Y.S.3d 520, 522 (2017).  Although plaintiff testified that she complained that the handcuffs were too tight, and that her hands "were starting to get swollen," she does not contend that she sustained any physical injury as a result.  Notably, she declined medical attention when offered it by officers, and the handcuffs were ultimately removed after she complained.  Viewing the evidence in the light most favorable to plaintiff, her

assault and battery claim fails because her injuries are insufficient to establish that the handcuffs were unreasonably tight.

## IV.    Malicious Prosecution

To succeed on a claim for malicious prosecution under Section 1983 and New York State law, a plaintiff must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." Dettelis v. Sharbaugh, 919 F.3d 161, 163–64 (2d Cir. 2019) (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)). A Section 1983 malicious prosecution claim also requires "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000) (citing Murphy, 118 F.3d at 944–46; and Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 116–17 (2d Cir. 1995)).[5]

### A.    Initiation of a Claim

Plaintiff argues that all the defendant officers participated in initiating the prosecution, whereas defendants contend that the evidence is clear that only Officer Flanagan did so.

A defendant initiates a proceeding when she "play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Id. "An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint." Ying Li v. City of New York, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017). "[A]n arresting officer may [also] be held liable for malicious prosecution [if she] creates false information likely to influence a jury's

---

[5] Claims for malicious prosecution under § 1983 are "substantially the same" as claims for "malicious prosecution under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003).

decision and forwards that information to prosecutors." Llerando Phipps v. City of New York, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005) (citation and quotation marks omitted).  "Showing that the police 'failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith' satisfies the initiation element of malicious prosecution." Bailey v. City of New York, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (quoting Manganiello v. City of New York, 612 F.3d 149, 160 (2d Cir. 2010).

It is undisputed that Officer Flanagan signed the misdemeanor criminal complaint and personally met with the Assistant District Attorney.  If she did indeed fail "to make a complete and full statement of facts to the Assistant District Attorney," this is enough for her to have participated in the initiation of a claim.

The same cannot be said of the other defendants.  Although plaintiff contends that they assisted in preparing various reports and paperwork, or that, in the case of Sergeant Chiusano, he signed off on this paperwork, these ministerial and routine actions cannot be said to constitute taking "an active role in the prosecution," Rohman, 215 F.3d at 215, and plaintiff's claims of malicious prosecution must be dismissed as against them.

### B.    Favorable Termination

"Under Section 1983 and New York law, a plaintiff seeking to prevail on a tort claim for malicious prosecution must prove that the underlying criminal proceeding against the plaintiff terminated in favor of the accused [*i.e.*, the plaintiff]." Kee v. City of New York, 12 F.4th 150, 162 (2d Cir. 2021) (internal quotations omitted).  In Lanning, the Second Circuit rejected the standard adopted by the Eleventh Circuit (under § 1983) and the New York Court of Appeals (under New York common law tort) that if a dismissal is "not inconsistent with" the plaintiff's

innocence, then the termination is favorable.  Lanning v. City of Glens Falls, 908 F.3d 19, 25 (2d Cir. 2018); see also Laskar v. Hurd, 972 F.3d 1278, 1289 (11th Cir. 2020); Cantalino v. Danner, 96 N.Y.2d 391, 729 N.Y.S.2d 405 (2001); Bellissimo v. Mitchell, 122 A.D.3d 560, 561, 995 N.Y.S.2d 603, 606 (2014).  Instead, the Second Circuit held that the termination must be "indicative of Plaintiff's innocence", Lanning, 908 F.3d at 25, a more demanding standard from a plaintiff's perspective.

Defendants contend that the dismissal of the charges against plaintiff was not a favorable termination.  They argue that although the prosecutor, in moving to dismiss the charges in the interests of justice, stated that B.C.'s bruises were caused by the school fight, "another student and Plaintiff could have both harmed B.C., and the dismissal of charges was not affirmatively indicative of Plaintiff's innocence."

Even under Lanning's more demanding standard, defendants go too far.  "Indicative" cannot mean an unqualified admission by the prosecutor that the person charged is innocent.  If it did, the Second Circuit would have said that the record must "establish" or "confirm" innocence. The use of the word "indicate," however, means that the basis for the dismissal must merely point to the defendant's innocence.  When a prosecutor informs the court that he is moving to dismiss because there is a key piece of evidence (B.C.'s bruises) that is no longer thought to be probative of guilt, as happened here, that is "indicative" of innocence, and the dismissal is a favorable determination.

This is confirmed by the Second Circuit's recent decision in Kee, 12 F.4th at 162-66, where the Court, reaffirming Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997), notwithstanding Lanning, held that a dismissal of a state court prosecution on speedy trial grounds presumptively qualifies as a favorable termination absent evidence to the contrary.  Of

course, a speedy trial dismissal, particularly one under state statutory law, see N.Y. Crim. P. L. §
30.30, as in Kee, rather than the Sixth Amendment, does not necessarily mean that it was
terminated in favor of the defendant.  But the Court held that it was "indicative of innocence."
Kee, 12 F.4th at 170.  If a speedy trial dismissal is presumed to constitute a termination in favor
of a defendant, the dismissal of plaintiff's criminal case, where we know that the dismissal
occurred because the prosecutor perceived a deficiency in the proof, certainly is under both state
and federal law.

    **C.**      **Deprivation of Liberty**

       Defendants next contend that no view of the facts demonstrates a deprivation of liberty
consistent with a post-arraignment "seizure," a necessary element of a malicious prosecution
claim.  See Rutigliano v. City of New York, 326 F. App'x 5, 8–9 (2d Cir. 2009) (quoting
Rohman, 215 F.3d at 215.  They rely principally on Faruki v. City of New York, 517 F. App'x 1,
2 (2d Cir. 2013), where the Second Circuit held that the mere requirement that a defendant show
up to court on two occasions was not a sufficient liberty deprivation to maintain the claim.

       Faruki is inapposite because, in that case, the plaintiff was never arraigned, as she was
here.  The Second Circuit has distinguished cases in which an arraignment has not yet occurred,
holding that a "pre-arraignment, non-felony summons requiring no more than a later court
appearance does not constitute a Fourth Amendment seizure." Burg v. Gosselin, 591 F.3d 95,
101 (2d Cir. 2010).  By contrast, the Second Circuit has "consistently held that a post-
arraignment defendant who is obligated to appear in court in connection with [criminal] charges
whenever his attendance [i]s required suffers a Fourth Amendment deprivation of liberty."
Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) (internal quotations omitted).  Notably, the
Court has also explicitly declined to apply the logic in Burg to cases such as the instant case.  Id.

(noting that "we decline to apply that dictum to the different context of a plaintiff who was required to appear in court in connection with criminal proceedings initiated by the defendant police officer.").

Therefore, as plaintiff was arraigned, and required to appear in court after such arraignment, she has adequately suffered a Fourth Amendment deprivation of liberty for purposes of her malicious prosecution claim.

### D.    Probable Cause

The lack of probable cause is also an essential element of a claim for malicious prosecution.  See Manganiello, 612 F.3d at 161.  Although probable cause to arrest and probable cause to prosecute often are co-extensive, probable cause to arrest does not automatically carry over to preclude a malicious prosecution claim.  See Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim . . .").  Of note, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013) (citation omitted).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."  Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003).

Probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." Drummond v. Castro, 522 F. Supp. 2d 667, 677-78 (S.D.N.Y. 2007) (citations and quotation marks omitted).  It is therefore possible that information can come to the attention of the police

post-arrest which dissipates the existence of probable cause for purposes of a malicious

prosecution claim.  See Gaston v. City of New York, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012).

As to Officer Flanagan, plaintiff asks the Court to draw one inference – that Officer

Flanagan, who was the only officer who briefed the Assistant District Attorney on the case and,

together with that prosecutor, prepared the criminal complaint – deliberately held back that B.C.

had recanted and belatedly attributed his bruises to the school incident, as had his mother upon

her arrest.

There is conflicting evidence as to whether Officer Flanagan knew of B.C.'s recantation.

Although she testified in her deposition that she did not, Officer Ramos testified that he informed

her that B.C. had recanted, and that B.C. was extremely disturbed emotionally.  Additionally,

circumstantial evidence suggests that Officer Flanagan heard B.C. screaming from an

interrogation room when his mother was standing at the front desk.  Under these circumstances,

asking a jury to find that Officer Flanagan knew of and did not inform the D.A. of the recantation

would not be too speculative.  Further, the jury might find that this contradictory information

triggered a duty to investigate, perhaps by calling B.C.'s school to determine whether the report

the mother told the officers about existed and corroborated this version of events.  Lowth, 82

F.3d at 571.

As there is a question of fact as to the existence of probable cause, defendants' motion to

dismiss the malicious prosecution claim as to defendant Officer Flanagan is denied.[6]

---

[6] Defendants' argument that they are entitled to qualified immunity cannot save them as summary judgment is only appropriate if "there is no dispute as to the pertinent events and the knowledge of the officers."  Weyant, 101 F.3d at 852; see also Jenkins v. City of N.Y., 478 F.3d at 88. ("[U]nder both New York and federal law . . . if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate.").  Here, there are factual disputes as to the knowledge of Officer Flanagan and the pertinent events.  Additionally, "the 'plainly incompetent or those who knowingly violate the law' . . . are precluded from claiming the protection of qualified immunity."  Moore v. Andreno, 505 F.3d 203, 214 (2d Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  If, in fact, Officer Flanagan was aware of B.C.'s recantation, a jury might find that by failing to inform the prosecutor of this fact, she knowingly violated the law or, at the least, acted incompetently.  Finally, defendants'

V.      **Fair Trial**

Plaintiff also brings a claim that she was denied her right to a fair trial.  "A fair trial claim

is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process

rights," Fappiano v. City of New York, 640 Fed. App'x. 115, 118 (2d Cir. 2016) (citing

Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir. 2010)), and may arise in multiple contexts.  For

example, a defendant's right to a fair trial may be violated when exculpatory evidence is

withheld, *i.e.,* when a Brady violation occurs, see Brady v. Maryland, 373 U.S. 83 (1963), or an

officer forwards fabricated evidence to prosecutors.  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d

123, 130 (2d Cir. 1997).

Here, plaintiff has premised her assertions and arguments on a fabrication of evidence

theory.  Such a claim is cognizable "[w]hen a police officer creates false information likely to

influence a jury's decision."  Id.  The deliberate omission of material information is treated the

same way as the fabrication of material information.  See Morse v. Fusco, 804 F.3d 538, 548 (2d

Cir. 2015).  To establish a fair trial claim based on fabrication of evidence, a plaintiff must show

that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's

verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of

life, liberty, or property as a result."  Garnett v. Undercover Officer C0039, 838 F.3d 265, 279

(2d Cir. 2016).

Under the fifth factor (deprivation of liberty "as a result of" the omitted or fabricated

evidence), a plaintiff must also prove that the omission of this information "caused" a

deprivation of liberty.  Here, "[a]a police officer's submission of false information to a

---

arguments as to malice must also fail.  See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 131 (2d Cir. 1997)
("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.").

prosecutor may in itself serve as a proximate cause of the deprivation of a criminal defendant's right to a fair trial and deprivation of liberty." Shabazz v. Kailer, 201 F. Supp. 3d 386, 398 (S.D.N.Y. 2016). And "a Section 1983 fair trial claim is available to a defendant even if the underlying criminal charges are dismissed and the fabricated evidence is never presented at trial." Kee, 12 F.4th at 168.

Plaintiff argues that if the defendant police officers had not withheld B.C.'s recantation from the prosecutor, a prosecutor would not have proceeded to file criminal charges. Defendants contend that causation between the alleged tortious conduct and the prosecutor's decision to go forward is lacking. They point to the fact that when the ADA moved to dismiss, he referenced the lack of proof concerning the beatings. Assuming the prosecutor did not know of the recantation, they argue, it wouldn't have mattered, because the prosecutor moved to dismiss for this alternative reason.

However, if defendant Flanagan deliberately "deceive[d] subsequent decision makers with false information, the chain of causation need not be considered broken because the officer can reasonably foresee that his misconduct will contribute to the subsequent decisions that result in a deprivation of liberty." Id. at 397. As there is a question of material fact as to whether Flanagan knew of and omitted the recantation in her discussions with the ADA, defendants' motion to dismiss this claim as to Officer Flanagan is denied.

However, defendants' motion is granted as to the other defendant officers. These officers may not be held directly liable as they did not directly forward the incomplete information to prosecutors, an essential element of this claim. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

## VI.    Failure to Intervene

Plaintiff alternatively contends that, even if the defendant Officers did not directly participate in the constitutional violations, they failed to intervene.  "A police officer 'has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.'" John v. City of New York, 406 F. Supp. 3d 240, 246 (E.D.N.Y. 2017) (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988).  Therefore, "liability attaches where (1) the officer had a realistic opportunity to intervene to prevent the harm; (2) a reasonable person in the officer's position would have known that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." Gochnour v. Burri, No. 15-cv-06174, 2018 WL 10944594, at *3 (W.D.N.Y. July 9, 2018).

As a preliminary matter, the viability of a failure to intervene claim is contingent on the viability of the underlying claim. See Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012). Accordingly, plaintiff's failure to intervene claims will only be assessed with regards to her surviving claims for malicious prosecution and denial of a fair trial. See Feinberg v. City of New York, 99-cv-12127, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004).

Plaintiff contends that the defendant officers were aware that B.C.'s constitutional rights were being violated.  Because defendants "were involved in preparing paperwork", they were "thus aware that said paperwork omitted key exculpatory information" and therefore "had an ongoing duty to intervene to ensure that this information reached" the District Attorney. However, plaintiff has not provided any evidence to suggest that defendants other than Sergeant Chiusano had any reason to believe that this information would not reach the Assistant District Attorney.

Defendants Bungay and Pierre-Antoine were finishing up their shifts and believed they had relayed all information necessary to Officer Flanagan. Defendant Officer Ramos, who was most involved in assisting Officer Flanagan with paperwork, made it clear in his deposition that he believed that she was aware of the recantation, and that she had spoken to the sergeant about this matter. Accordingly, he would have no reason to believe she would not also speak to the Assistant District Attorney about this. As plaintiff has failed to introduce any facts that these officers were aware of any alleged constitutional deprivation, plaintiff's failure to intervene claims are dismissed as to them.

But plaintiff has presented some evidence, albeit slight, to suggest that Sergeant Chiusano may have been made aware of the recantation. Sergeant Chiusano testified to not remembering whether he had been made aware by Officer Flanagan. Likewise, Officer Flanagan has denied knowing of the recantation so, according to her version of events, she could not have alerted him to this fact. However, Officer Ramos testified that he believed that Officer Flanagan had informed the sergeant of this, and that the sergeant had directed her to proceed. Therefore, as there is a genuine dispute of material fact here as to Sergeant Chiusano's awareness, plaintiff may proceed on her malicious prosecution and fair trial claims under this theory as to Sergeant Chiusano and in the alternative with respect to Officer Flanagan. See Davis v. City of New York, No. 13-cv-6260, 2021 WL 3492307, at *13 (E.D.N.Y. Aug. 9, 2021).

**VII. Supervisory Liability**

Finally, plaintiff has asserted that Sergeant Chiusano should also be held liable under a theory of supervisory liability. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F. 3d 133, 138 (2d Cir. 2013). "To hold a state official liable under § 1983, a plaintiff must

21

plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 618, 620 (2d Cir. 2020).

The record contains no evidence suggesting that Chiusano communicated with the District Attorney's Office.  He could not have initiated the prosecution for the purposes of plaintiff's malicious prosecution claim, nor could he have forwarded any false evidence for the purposes of her fair trial claim.  Accordingly, plaintiff's claim for supervisory liability against him is dismissed.

<strong>CONCLUSION</strong>

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's claims of malicious prosecution and denial of a fair trial against Officers Flanagan and Sergeant Chiusano will be set down for trial by separate Order.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____

U.S.D.J.

Dated: Brooklyn, New York
       March 30, 2022